**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

WILLIAM DEAN CALLAS,

    *Plaintiff*,

v.

PENNY CALLAS, GEORGE CALLAS, AND YVONNE CALLAS, IN THEIR CAPACITIES AS THE CO-EXECUTORS OF THE ESTATE OF CONSTANTINE CALLAS,

    *Defendants*.

Civil Action No. 14-7486

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This matter concerns the value of certain real property in Edgewater, New Jersey (the "Property"). Currently, two motions are pending before the Court: (1) Plaintiff William Callas' motion for an order declaring that Defendants George Callas and Yvonne Callas[1] have no admissible evidence concerning the value of the Property (D.E. 258); and (2) Defendants' motion to preclude Plaintiff's expert, Anthony J. Rinaldi, from testifying based on alleged deficiencies in his expert report (D.E. 259). The Court reviewed all submissions made in support and opposition,[2] and heard oral argument from the parties on May 20, 2020. D.E. 281. For the reasons stated

---

[1] Plaintiff notes that in January 2016, Plaintiff entered into a settlement agreement with Defendant Penny Callas, the third co-executor of the Estate of Constantine Callas. D.E. 258 at 1, n.1. Accordingly, "Defendants" refers only to George Callas and Yvonne Callas.

[2] Plaintiff's brief in support of his motion is referred to as "Pl.'s Br." (D.E. 258); Defendants' opposition is referred to as "Def.'s Opp." (D.E. 263); and Plaintiff's reply is referred to as "Pl.'s Reply" (D.E. 274). Defendants' brief in support of their motion is referred to as "Def.'s Br." (D.E. 259); Plaintiff's opposition is referred to as "Pl.'s Opp." (D.E. 267); and Defendants' reply is referred to as "Def.'s Reply" (D.E. 272).

below, Plaintiff's motion is **GRANTED in part** and **DENIED in part**. Defendants' motion is **DENIED**.

I. BACKGROUND

Plaintiff brought this action against Defendants, co-executors of the Estate of Constantine Callas (the "Estate"), to settle a dispute over the value of Constantine's ownership interest in a real estate holding company, Coffee Associates LLC (the "LLC"). Plaintiff and Constantine were the only members of the LLC, which was governed by an operating agreement (the "Operating Agreement"). The LLC's primary asset is the Property. Prior to his death, Constantine held a 40% interest in the LLC, and Plaintiff held the other 60% interest. Constantine passed away on February 23, 2013. Pursuant to the Operating Agreement, a deceased member's representatives may exercise a "Put Option" requiring the surviving member to purchase the deceased member's interest in the LLC. Accordingly, upon Constantine's death, Defendants timely exercised the "Put Option" on behalf of the Estate, thereby obligating the Estate to sell – and Plaintiff to buy – the Estate's 40% interest in the LLC.

The Operating Agreement sets forth the terms by which the "Purchase Price" of the Estate's interest is to be calculated. Section 14.2(d) of the Operating Agreement provides, in relevant part, as follows:

> Purchase Price. The purchase price of each LLC interest shall be eighty (80%) percent of the base purchase price as calculated in Section 14.4 of this Agreement using an Applicable Valuation Date as of the Date of Disability or Death[.]

D.E. 21-2, Ex. A, ¶ 14.2(d). Section 14.4, in turn, defines "Base Purchase Price" as follows: "[t]he base purchase price for the Interest being sold by such Member selling all of his Interest shall be the Valuation Purchase Price, multiplied by the LLC percentage interest being sold." *Id*. ¶ 14.4. Section 1.24 defines "Valuation Purchase Price" as follows:

> "Valuation Purchase Price" shall mean the purchase price for a LLC interest as of the Applicable Valuation Date equal to the sum of (i) and (ii) and (iii) below:
>
> > (i) The *Appraised Value* as of the Applicable Valuation Date of all real property interests owned by the LLC, whether such ownership interest is direct or indirect through a partnership or other entity; plus
> >
> > (ii) The agreed upon fair market value as of the Applicable Valuation Date of all other tangible and/or intangible personal property (including stocks, bonds and other financial instruments) owned by the LLC; less
> >
> > (iii) The amount of all liabilities of the LLC, and all liabilities secured by property owned by the LLC, whether such ownership interest is direct or indirect through a partnership or other entity, to the extent not already taken into account above.

*Id.* ¶ 1.24 (emphasis added). Taking these provisions together, the "Purchase Price" at which Plaintiff is required to buy out the Estate's interest is dependent upon the Property's "Appraised Value" as of the "Applicable Valuation Date" – *i.e.* February 23, 2013, the date of Constantine's death.

Plaintiff submitted both an expert report and a rebuttal report in support of his claimed appraised value of the Property. D.E. 164-2, 164-3. Plaintiff's reports were authored by Anthony J. Rinaldi, who appraised the Property at $2.1 million. *See* Pl.'s Br. at 4. Defendants likewise submitted an expert report[3] in support of their claimed appraised value of the Property. D.E. 259-6. Defendant's report was authored Robert McNerney, who appraised the Property at $12.615 million. Def.'s Opp. at 4. In addition to their expert's appraisal, Defendants also seek to introduce three offers to purchase the Property made by three different entities. Def.'s Opp. at 5-7. The

---

[3] Plaintiff raises objections to McNerney being considered as an expert. The Court addresses this issue in note 8.

3

parties' current dispute primarily concerns the evidence that is admissible in determining the "Appraised Value" of the Property as of February 23, 2013.

## II.     PROCEDURAL HISTORY

The parties filed their respective motions on September 12, 2019. Plaintiff filed his motion seeking an order declaring that Defendants have no admissible evidence concerning the "Appraised Value" of the Property. D.E. 258. Defendants filed opposition, D.E. 263, to which Plaintiff replied, D.E. 274. Defendants likewise moved to preclude Plaintiff's expert from testifying based on alleged deficiencies in his expert report. D.E. 259. Plaintiff filed opposition, D.E. 267, to which Defendants replied, D.E. 272.

## III.    LEGAL STANDARD

"Under the Federal Rules of Evidence, it is the role of the trial judge to act as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). To fulfill its role as gatekeeper, a court analyzes the admissibility of an expert's testimony pursuant to the three requirements of Federal Rule of Evidence 702: "(1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."[4] *Kannankeril*, 128 F.3d at 806 (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-42 (3d Cir. 1994)).

---

[4] The full language of Federal Rule of Evidence 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

4

Accordingly, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 741-43). "Qualification" requires a witness to have a specialized expertise. The Third Circuit has "interpreted this requirement liberally, holding that 'a broad range of knowledge, skills, and training qualify an expert.'" *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404 (citations omitted). "Reliability" requires that the testimony "be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Id.* (citation and internal quotation marks omitted). Thus, guided by *Daubert,* the Third Circuit has found that reliability of scientific evidence requires assessing its scientific validity. *Id.* Finally, "fit" requires that the expert's testimony "be relevant for the purposes of the case and must assist the trier of fact." *Id.* Once again, guided by *Daubert,* the Third Circuit has found that, to be helpful, the testimony must have "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* (citation omitted).

The Third Circuit has also made clear that when a district court evaluates the admissibility of expert testimony, perfection is not the standard. Instead, district courts should extend a "liberal policy of admissibility" to an expert's substantive and formal qualifications. *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d at 741. Similarly, as for "reliability," a district court must find "good

---

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

5

grounds" for the expert's belief after conducting a "flexible" inquiry. *Id.* at 742. Finally, a district court applies the same standard to find "fit" as for finding reliability. The Third Circuit has "emphasize[d] that the standard is not that high." *Id.* at 745.[5]

## IV.    ANALYSIS

The Court exercises diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) and (c)(2) ("[T]he legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent[.]"). In diversity cases, courts look to the choice-of-law rules of the forum state – here, New Jersey – to decide which body of substantive law to apply when interpreting a contract provision. *Collins ex rel. Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017). "New Jersey choice-of-law rules provide that '[o]rdinarily, when parties to a contract have agreed to be governed by the laws of a particular state, New Jersey courts will uphold the contractual choice.'"[6] *Id.* (quoting *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 130 N.J. 324, 341 (1992)). Here, the Operating Agreement contains a choice-of-law provision requiring that it be governed by New Jersey law. *See* D.E. 21-2, Ex. A, ¶ 15.7 ("This Agreement shall be governed by and construed in accordance with the laws of the State of New jersey."). Accordingly, the Court finds the Operating Agreement's choice-of-law provision valid, and interprets the Operating Agreement in accordance with New Jersey substantive law. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir. 1990) (citing *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)).

---

[5] Defendants also make a single reference to the prohibition on net opinions. Def.'s Br. at 16. Because the issue is not sufficiently raised or analyzed, the Court does not address it here.

[6] Although there are exceptions to this general rule, the parties do not argue that an exception applies.

6

Under New Jersey law, when interpreting a contract, the Court must determine the intention of the parties as revealed by the language in the agreement. *Globe Motor Co. v. Igdalev,* 225 N.J. 469, 483 (2016). To this end, the plain language of the contract is ordinarily the best indicator of the parties' intent. *Chubb Customs Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008). In other words, unless there exists an actual ambiguity in the contract, a court should not engage in a strained reading of the agreement to justify a different result than that which the parties bargained for. *Id.*; *see also CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC*, 410 N.J. Super. 114, 120 (App. Div. 2009) ("Absent ambiguity, the intention of the parties is to be ascertained by the language of the contract. If the language is plain and capable of legal construction, the language alone must determine the agreement's force and effect."). An ambiguity exists when the contractual language is "susceptible to at least two reasonable alternative interpretations[.]" *Chubb Customs Ins. Co.*, 195 N.J. at 238 (citing *Nester v. O'Donnell,* 301 N.J. Super. 198, 210 (App. Div. 1997)).

Here, the relevant language of the Operating Agreement is clear: the price at which Plaintiff must buy out the Estate's interest is based, in part, on the "Appraised Value" of the Property as of February 23, 2013. Accordingly, the issue before this Court turns on what evidence is admissible in determining the "Appraised Value" of the Property. As a result, the contractual term – "Appraised Value" – controls, as opposed to more generalized common law principles regarding various methods of valuing real property. *See CSFB 2001-CP-4 Princeton Park*, 410 N.J. Super. at 120 (App. Div. 2009). The term "Appraised Value" is not defined in the Operating Agreement, but at a minimum the plain language and use of that term renders inadmissible any evidence that does not involve an appraisal of the Property as of February 23, 2013. Therefore, the three offers-for-sale relied upon by Defendants are inadmissible, as such offers do not purport to establish the

7

"Appraised Value" of the Property as of the applicable valuation date.[7] As a result, the parties are left with their respective expert appraisal reports, which the Court addresses in turn.

### A. Defendants' Expert Robert McNerney

Defendant's expert is Robert McNerney.[8] McNerney's appraisal report dated October 5, 2015 values the Property at $12.615 million as of the applicable valuation date. D.E. 259-6,

---

[7] Even if the Court were to consider the three offers as evidence of the Property's "Appraised Value," the Court would still find those offers to be inadmissible because they do not reflect the Property's appraised value *as of the applicable valuation date*, i.e. February 23, 2013. Rather, one of the purported offers was made in 2016, with the other two offers made in 2019. *See, e.g.*, Pl.'s Br. at 6-7. As such, the offers do not purport to reflect the appraised value of the Property as of the applicable valuation date, February 23, 2013, as required by the Operating Agreement. There are other potential shortcomings concerning the offers, but the Court does not address them here.

[8] Plaintiff argues that McNerney should not be permitted to serve as Defendants' expert witness. Plaintiff claims that McNerney testified during his December 15, 2016 deposition that he never agreed to serve as an expert for Defendants nor permitted his report to be used in this case. *See* Pl.'s Br. at 10; *see also* D.E. 264-1, 44:10-15, 58:9-23, 59:7-10. In response, Defendants argue that they properly disclosed McNerney as an expert, that McNerney has agreed to serve as Defendants' expert in this case, and that McNerney has allowed Defendants to use his expert report in this case. *See* D.E. 263-12, McNerney Decl. ¶¶ 4-6. Plaintiff responds by noting that in the three years since McNerney's deposition, Defendants have not proffered anything to suggest that McNerney would be their expert – except Defendants now provide a declaration by McNerney dated October 25, 2019 in which McNerney states that he has agreed to be Defendants' expert in this case. *See* D.E. 263-12, McNerney Decl. ¶ 6. In sum, Plaintiff argues that McNerney should not now be permitted to serve as Defendants' expert because Defendants did not comply with the pretrial scheduling orders in this case relating to the disclosure of expert reports, D.E. 22, 56, and because McNerney's report fails to comply with the requirements of Rule 26(a)(2)(B)(iv), (v), and (vi).

While the Court understands Plaintiff's position, the Court nonetheless will permit McNerney to serve as Defendants' expert. McNerney did provide a written expert report, and Plaintiff was also able to depose McNerney as to the contents of his report. Accordingly, the Court finds that there will be no "unfair surprise" should McNerney be permitted to serve as Defendants' expert. *See Russell v. Absolute Collection Services, Inc.*, 763 F.3d 385, 396 (4th Cir. 2014) ("The purpose of Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise."); *see also Raritan Baykeeper, Inc. v. NL Industries, Inc.*, No. 094117, 2017 WL 3568401, at *6 (D.N.J. Aug. 16, 2017) ("[Rule 26(a)(2)(B)(i)] is intended to protect opposing parties from unfair surprise and to allow such parties an opportunity to develop evidence to meet the expert testimony being [proffered] by the party that hired the expert.").

8

McNerney Report at 3.[9]  McNerney arrived at this valuation by (1) determining that the Property was 4.35 acres[10]; (2) assuming that the Property had a developable density of 50 units per acre[11]; and (3) using the "sales comparison approach"[12] to determine the appropriate price per unit to be $60,000. Def.'s opp. at 5.  McNerney then multiplied the total acreage of the Property (4.35 acres) by its developable density (50 units/acre) to arrive at a total of 217 buildable units. *Id*.  McNerney multiplied the 217 units by the price per unit ($60,000), resulting in a valuation of $13,020,000.

---

[9] The cited page numbers associated with McNerney's expert report correspond to the page numbers assigned by the Court's electronic filing system (CM/ECF).

[10] The Court notes that McNerney appraises the Property at 4.35 acres, while Rinaldi appraises it at 4.14 acres. *Compare* D.E. 259-6, McNerney Report at 15, *with* D.E. 164-2, Rinaldi Report at 94.  This difference, however, is immaterial to the Court's ultimate decision.

[11] The Court notes that McNerney erroneously believed when creating his report that the Property's zoning (as per Edgewater's zoning ordinances) as of the applicable valuation date was "OR-1." *See* D.E. 259-6, McNerney Report at 5.  Nonetheless, McNerney's report "assumed" as a "hypothetical condition" that the Property was instead approved for "residential development based upon a density of 50 units to the acre." *Id*. at 15.  Moreover, McNerney apparently equated a density of 50 units/acre with "R-5" zoning. D.E. 263-12, McNerney Decl. ¶ 12. In reality, the Property was zoned "MXD-1" as of the applicable valuation date. MXD-1 zoning, however, also permits a density of 50 units/acre.  Therefore, Defendants contend that McNerney's analysis was ultimately unaffected because McNerney's alleged "hypothetical assumption" was, in fact, accurate because MXD-1 zoning permits development at a density of 50 units/acre. Def.'s Opp. at 19; D.E. 263-12, McNerney Decl. ¶ 11. The Court agrees that McNerney's assumption of OR-1 zoning was erroneous, but that the error was immaterial because he in effect considered the requirements of the proper zoning, MXD-1. However, the Court finds other errors in McNerney's assumption, which are addressed below.

[12] "There are three basic approaches commonly used to value real estate: [1] the cost approach, [2] the sales comparison (or market data) approach, and [3] the income capitalization approach, or any combination of these three." *In re Mocco*, 222 B.R. 440, 457 (Bankr. D.N.J. 1998) (citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* (9th ed. 1987)).  The sales comparison approach "is a method of estimating market value by comparing the subject property to similar properties that have been recently sold or listed for sale in the same or competing areas," with "[u]pward or downward adjustments [made] to the price of the comparable properties [] to account for the differences between the subject property and the sales comparables." *Id*.

9

*Id*. McNerney then subtracted $405,075 worth of "demolition costs"[13] to arrive at his final appraised value of $12,614,925 – rounded to $12.615 million. *Id*.

The Court finds that McNerney may testify as to his price-per-unit calculation of $60,000 but may *not* testify as to his projected number of buildable units (217). With respect to McNerney's testimony regarding his price-per-unit calculation of $60,000, the Court finds that such testimony is sufficiently reliable for the Court to admit it under Fed. R. Evid. 702. To be admissible, the Court must find that McNerney's $60,000 price-per-unit calculation was based on reliable methods and procedures as opposed to speculation or subjective belief. *Schneider ex rel. Estate of Schneider*, 320 F.3d at 404. For admissibility purposes, McNerney sufficiently applied the "sales comparison approach" in opining that the price per unit was $60,000. *See* D.E. 259-6, McNerney Report at 34-37.

However, with respect to McNerney's testimony regarding his projected 217 buildable units, the Court finds that such testimony is not sufficiently reliable to be admitted under Fed. R. Evid. 702. As a preliminary matter, it appears from McNerney's report that he simply assumed that the *entirety* of the Property's 4.35 acres was buildable at 50 units an acre, thus resulting in a projected total of 217 buildable units (4.35 x 50).[14] To the extent that McNerney's opinion

---

[13] While it is not entirely clear to the Court how McNerney arrived at his $405,075 calculation of "demolition costs," Plaintiff does not challenge this calculation.

[14] Defendants contend that the Property's "allowable density [i.e. 50 units/acre] is measured based on total acreage." Def.'s Br. at 12; Def.'s Reply at 8 (as to Rinaldi's contention that the Property's topography limits its developable area to only 2.1 acres, arguing that "this is irrelevant because allowable density is based on total acreage [so] [e]ven assuming only 2.1 acres are developable, hundreds of units could still be built under MXD-1 zoning"). In other words, Defendants argue that, notwithstanding any physical or legal limits on the Property, 217 units can still be built on the Property because MXD-1 zoning "allows development at a density of 50 units/acre *as of right*." Def.'s Opp. at 5 (emphasis added); Def.'s Reply at 7 ("Current zoning allows development of at least 220 units *by right*.") (emphasis in original). Taken together, it appears Defendants argue that the Property can be developed to a maximum density of 217 units notwithstanding any physical or

regarding the 217 buildable units is premised upon such simple multiplication, such an opinion would neither implicate "matters requiring scientific, technical or specialized knowledge" nor would "assist the trier of fact." *Kannankeril,* 128 F.3d at 806 (explaining that, under Fed. R. Evid. 702, "the expert must testify about matters requiring scientific, technical or specialized knowledge" and "the expert's testimony must assist the trier of fact"). In short, the trier of fact is more than capable of performing such basic multiplication.

To the extent that McNerney's 217-unit projection is based on McNerney's opinion that, *in fact*, no physical or legal limits would preclude building 217 units on the Property, the Court finds that McNerney fails to provide a sufficient basis for this opinion.[15] Plaintiff argues that McNerney fails to account for several physical and legal limitations which, Plaintiff claims, significantly reduces the number of buildable units. Pl.'s Reply at 6-7. For example, Plaintiff

---

legal limits on the Property because, as Defendants contend, "allowable density" is based on total acreage and permitted "as of right." The Court, however, finds this argument wholly unpersuasive and unsubstantiated. First, and most notably, Defendants do not cite to any legal authority for their argument. Second, Defendant's argument simply defies common sense. For example, if the 4.35 acres included 3 acres of wetlands that could not be developed due to legal prohibitions, Defendants would nevertheless assert that all 4.35 acres must be considered in determining the number of units that could be built. The Court disagrees. Or, if the 4.35 acres included 3 acres of steep rockface that could not be developed without extraordinary demolition and excavation costs, Defendants would still assert that all 4.35 acres must be considered in calculating the number of units that could be built. Again, the Court disagrees. At a minimum, Defendants would be forced to account for the demolition and excavation costs.

[15] The Court notes that Defendants appear to concede that the entire acreage of the Property is not suitable for development. To this point, Defendants argue that "McNerney never assumed the foundation would cover the entire surface area of the Property," but rather "McNerney recognized that the western [] portion of the Property has steep slopes; his analysis did not ignore this." Def.'s Opp. at 22. However, Defendants do not cite to any portion of McNerney's report to support their assertion that McNerney took into consideration the sloped topography of the Property when concluding that 217 units could be built. To the contrary, McNerney's report instead states that "the [Property] is a 4.35 acre site which is *predominantly level* and at street grade. *There are no known impediments to developing the lot to its maximum potential allowed by zoning*." D.E. 259-6, at 19.

11

notes that McNerney's analysis disregards the Property's topography, such as its irregular shape and steep slopes, which Plaintiff claims cuts the Property's buildable acreage approximately in half pursuant to Edgewater's steep slope ordinance. Pl.'s Reply at 7 (citing Edgewater Borough Code § 240-116 (building limits on steep slope areas)). Moreover, Plaintiff notes that McNerney likewise does not account for MXD-1 zoning's maximum building height restriction of 5-stories/60-feet, as well as MXD-1 zoning's prohibition of residential use on the first floor. *Id*. (citing Edgewater Borough Code § 240-117.1(D)(1)(c) (multifamily residential use in MXD-1 zone permitted only "above first floor") and § 240-117.1(E), Schedule X-2 (5 stories/60 feet maximum building height in MXD-1 zone)) Lastly, Plaintiffs note that McNerney also does not take into consideration the parking requirements for mid-rise residential buildings. *Id*. (citing N.J.A.C. 5:21-4.14(b) and accompanying Table 4.4 (requiring for a mid-rise residential building 1.8 parking spaces for each one-bedroom apartment, 2 parking spaces for each two bedroom apartment, and 2.1 parking spaces for each three bedroom apartment)). Plaintiff argues that the forgoing deficiencies renders McNerney's opinion inadmissible.

The Court agrees. At a minimum, McNerney would have to sufficiently explain either (1) why no physical or legal limits exist that would preclude 217 units from being built on the Property; or (2) how 217 units could be built on the Property despite any physical or legal limits. McNerney fails to address either. Rather, McNerney merely opines that 217 units *can* be built, without providing a sufficient basis for concluding so. In other words, the Court finds no "good grounds" upon which McNerney bases his opinion that 217 units can be built on the Property. *See In re Paoli Railroad Yard PCB Litigation,* 35 F.3d at 732 ("*Daubert* requires the district court to act as 'gatekeeper' and to assure that the scientific methodology upon which the expert opinion is founded is reliable, i.e., that the expert's conclusion is based on good grounds[.]"). As such,

McNerney's opinion as to the 217 buildable units is not sufficiently reliable for the Court to admit it under Fed. R. Evid. 702.

In sum, McNerney's report insofar as it relates to his projected 217 buildable units is excluded because it does not satisfy *Daubert*'s "fit" requirement. *See W Am. Ins. Co.*, 2008 WL 5244232, at *5 ("Under New Jersey law, an 'expert's bare conclusions, unsupported by factual evidence' are an inadmissible 'net opinion.'") (quotation omitted); *see also Curtis*, 2007 WL 3232589, at *7 ("An expert who offers an opinion without providing specific underlying reasons for the conclusions 'ceases to be an aid to the trier of fact and becomes nothing more than an additional juror.'") (quotation omitted)). Accordingly, McNerney may testify as to his price-per-unit calculation, but may not testify as to his projected number of buildable units.

### B. Plaintiff's Expert Anthony J. Rinaldi

Plaintiff's expert is Anthony J. Rinaldi. Rinaldi's appraisal report dated May 17, 2016 values the Property at $2.1 million as of the applicable valuation date.[16] D.E. 164-2. Rinaldi arrived at this valuation by (1) using the "sales comparison" approach in determining the Property's fee simple value to be $2.1 million based on its existing industrial use; (2) using the "subdivision development" method[17] in determining the Property's fee simple value to be $1.71

---

[16] As explained by Plaintiff, "the reliability of Rinaldi's methodology in concluding that the value of the Property as if vacant was $1.7 million [versus $2.1 million as improved] is addressed solely in Sections I and III of Rinaldi's expert report." Pl.'s Br. at 1, n.1 (noting that, taken together, Sections I and III of Rinaldi's report, "ignore[] the existing long-term lease on the Property [] and opine[] that the $2.1 million value of a fee simple interest in the Property as improved exceeds the Property's $1.7 million value as if vacant"). Plaintiff further notes that "[t]hat opinion is in no way based or dependent upon the alternative scenarios addressed in Sections II, IV, or V of Rinaldi's report, each of which, in contrast to Rinaldi's fee simple analysis in Sections I and III, takes into account the existence of the Lease." *Id.*

[17] As explained by the United States Tax Court in *Crimi v. C.I.R.*, 105 T.C.M. (CCH) 1330 (Tax 2013):

13

million assuming the Property was appraised as "vacant land, ready for redevelopment as an apartment complex"; and (3) comparing those two valuations to reach his conclusion that the Property's value as if vacant and ready for development ($1.71 million) was less than the Property's value as an existing industrial use ($2.1 million). *See* D.E. 164-2, Rinaldi Report at 5, 10, 93.[18] Accordingly, Rinaldi concluded that the Property's "highest and best use" as of the applicable valuation date was its existing industrial use, and therefore, the Property's appraised value as of the applicable valuation date was $2.1 million.

Here, the Court finds that Rinaldi's testimony is sufficiently reliable to be admissible under Fed. R. Evid. 702. While Defendants make various arguments as to why Rinaldi should be precluded from testifying, these arguments are unpersuasive or go to the weight of Rinaldi's testimony rather than its admissibility. For example, Defendants argue that Rinaldi "applie[d] the [subdivision development] method incorrectly as a matter of law." Def.'s Br. at 17. Defendants

---

> The subdivision development method consists of six primary steps. As the first step, the subject property's highest and best use is determined. Second, the market approach is used to identify comparable finished (developed) lots and a per-lot value is derived. Third, anticipated gross proceeds from the sale of the developed lots is calculated by multiplying the per-lot value by the total number of estimated finished lots. Fourth, expected net proceeds are calculated by reducing the expected gross proceeds by direct and indirect costs and entrepreneurial profit. Fifth, net sales proceeds are discounted to present value at a market-derived rate over the development and market absorption period. Sixth, appropriate discounts for lack of marketability, partition, and market absorption are applied where appropriate. The resulting figure equals the indicated value of the undeveloped land.

*Id*. at *22, n.28 (citing Appraisal Institute, *The Appraisal of Real Estate* 370-376 (13th ed. 2008)). "The subdivision development method is a variation of the income approach," which "values undeveloped land by treating the property as if it were subdivided, developed, and sold." *Id.*

[18] The cited page numbers associated with Rinaldi's expert report correspond to the page numbers assigned by the Court's electronic filing system (CM/ECF).

claim that, in this case, Rinaldi made the same analytical mistake that rendered his methodology unreliable in *Crimi*: that "Rinaldi incorrectly reduced the value of an undeveloped lot by development costs rather than subtracting those costs from the value of a developed lot as required under" the subdivision development method. *Crimi*, 2013 WL 561347, at *20; Def.'s Br. at 17. In other words, Defendants claim that, in this case, Rinaldi incorrectly derived his "per-lot value" of $50,000 by using *undeveloped* lots of comparable properties when he should have instead used *developed* lots. Def.'s Br. at 17; Def.'s Reply at 6; *see also Crimi*, 2013 WL 561347, at *20 ("We decline to rely on the values for undeveloped lots proffered in the Rinaldi report because under the subdivision development analysis we look to *developed* lots of comparable properties, not *undeveloped* lots.") (emphasis added)). In short, Defendants argue that Rinaldi made the same methodological error in this case that he did in *Crimi*.

Plaintiff responds that Rinaldi did not make the same error in this case. Rather, Plaintiff contends that Rinaldi did, in fact, use *developed* lots of comparable properties as opposed to *undeveloped* lots. Pl.'s Opp. at 17-19. Indeed, Rinaldi certified that "[i]n Section 3 of [his] [r]eport, which utilizes the subdivision development method to analyze the Property's highest and best use as if vacant, [he] used comparables that [he] personally knew to be site developed, but vacant with approvals for development for multifamily residential use." D.E. 265, Rinaldi Cert. ¶ 19. Accordingly, it appears that Rinaldi properly applied the subdivision development method so as to render his testimony sufficiently reliable under Fed. R. Evid. 702.[19]

---

[19] Defendants reiterate in their reply brief that Rinaldi, in fact, did not use developed comparable properties, but rather used undeveloped comparable properties. In support of this contention, Defendants submit the declaration of Gregory M. Dexter – counsel for Defendants – who claims that Rinaldi's comparables #3 and #4 were sales of undeveloped properties. *See* D.E. 272-1, Dexter Decl., ¶¶ 5, 7. Accordingly, the Court is left with a certification from Plaintiff claiming that Rinaldi used *developed* properties as comparables, and a declaration from Defendants claiming that Rinaldi used *undeveloped* properties for two of his comparables. However, even

15

Moreover, as to Defendants' claim that Rinaldi merely "parrots" the analysis of Jeffrey L. Morris,[20] Def.'s Br. at 21-22, the Court disagrees. As an initial matter, "[w]hile experts may not simply 'parrot' [the] ideas of other experts, they 'are permitted to rely on materials used by other experts in developing their own opinions.'" *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (quoting *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008)). Experts are permitted to "use a mix of objective data and subjective analysis from another expert to . . . create an admissible report, and the testifying expert's knowledge regarding the underlying facts go[es] to the weight accorded to [that expert's] report and testimony, rather than its admissibility." *Id.* (internal citations omitted); *see also E. Allen Reeves, Inc. v. Michael Graves & Assocs.*, No. 10-1393, 2015 WL 105825, at *5, (D.N.J. Jan. 6, 2015) (explaining that an expert "may rely on the opinion of another expert in formulating his or her opinion").

Defendants argue that Rinaldi improperly relied on what they describe as Morris's "unsubstantiated opinions" when Rinaldi deducted certain costs in calculating the Property's appraised value. Def.'s Br. at 20. For example, Defendants claim that neither Rinaldi nor Morris

---

assuming Defendants are correct that comparables #3 and #4 were, in fact, undeveloped properties, there is nothing to suggest that Rinaldi's other comparables were also undeveloped properties, or that any alleged flaws with comparables #3 and #4 render Rinaldi's methodology entirely unreliable. The Court notes that Rinaldi indicated that he also made several adjustments – both negative and positive – to his comparables in order to account for differences in location, size, topography, and permitted uses. *See* D.E. 164-2, Rinaldi Report at 100-04. Such adjustments further demonstrate the sufficient reliability, for admissibility purposes, of Rinaldi's methodology. To the extent that Defendants believe Rinaldi made errors in his methodology or choice of comparables, they are certainly free to cross-examine him on that area.

[20] Jeffrey L. Morris is a civil engineer with whom Rinaldi consulted when creating his expert report. Morris is not a testifying expert in this case. The information provided by Morris was reduced to writing and disclosed to Defendants with Rinaldi's report.

provides an explanation for deducting approximately $950,000 in "site improvement costs," including $100,000 to remove and remediate an underground tank; $214,200 for retaining walls; $140,000 for storm drainage; $150,000 for rock blasting; and $350,000 for demolition expenses.[21] *Id*.; Def.'s Reply at 9. However, those costs are not "unsubstantiated," but are instead sufficiently accounted for so as to permit Rinaldi to testify to them.[22] *See, e.g*, Rinaldi Report at 127-28; *see also* Rinaldi Cert. ¶¶ 12(d), 13.

Defendants also take issue with Morris's conclusion, which Rinaldi relies upon and incorporates into his report, that no more than 86 units can be built on the Property. Def.'s Reply at 7. Defendant contends that "there is no foundation for [this conclusion] whatsoever." *Id*. In reaching that projection, however, both Rinaldi and Morris appear to sufficiently account for the applicable zoning regulations, the applicable state administrative codes regarding parking spaces for residential complexes, and the Property's alleged topographical impediments.

In sum, Rinaldi's testimony, based on his report, is admissible. To the extent that Defendants believe Rinaldi made errors in his own analysis, or that his reliance upon Morris's analysis was unreasonable, Defendants are certainly free to cross-examine Rinaldi on those issues.

---

[21] The Court notes that Defendants take issue with Rinaldi's proposed $350,000 in demolition costs, when, in fact, McNerney's demolition costs are $405,075. *See* D.E. 259-6, McNerney Report at 44.

[22] Defendants appear to conflate Rinaldi's calculations regarding "site improvement costs" with that of "environmental costs." *See* Def.'s Reply at 9. Defendants are correct in their contention that Rinaldi himself stated that "[t]he existence of any soil contamination, groundwater contamination, asbestos, lead paint, radon gas. . . or any other hazardous or potential hazardous materials . . . was not observed." D.E. 164-2, Rinaldi Report at 157. But to the extent that Defendants argue that this necessarily means that no "site improvement costs" would otherwise be needed to render the Property developable, their argument fails. Moreover, it does not appear that Rinaldi deducted any "environmental costs" when valuing the Property, but rather limited his deductions to the "site improvement costs" accounted for above.

*See NN&R, Inc. v. One Beacon Ins. Grp.*, 2006 WL 2845703, at *3 (D.N.J. Sept. 29, 2006) (finding that although the expert witness's "opinions may be assailable at trial on cross-examination because he failed to personally examine the insurance claim files or other key documents, it appears to the [c]ourt that the expert's opinion and methodology are sufficiently reliable and relevant to meet the requirements of Fed. R. Evid. 702").

**V.   CONCLUSION**

For the reasons stated above, Plaintiff's motion, D.E. 258, is **GRANTED in part** and **DENIED in part**.  Defendants' motion, D.E. 259, is **DENIED**. An appropriate Order accompanies this Opinion.

Dated: June 25th, 2020

John Michael Vazquez, U.S.D.J.